# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CEDAR RAPIDS DIVISION

| | | |
|---|---|---|
| KATIE J. STREIGHT | ‖ | |
| Plaintiff, | ‖ | No. C05-0133 |
| vs. | ‖ | **ORDER** |
| JO ANNE B. BARNHART, Commissioner of Social Security, | ‖ | |
| Defendant. | ‖ | |

_____

This matter comes before the court pursuant to briefs on the merits of this application for disability insurance benefits. On July 29, 2005, the parties consented this matter to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) (docket number 14). The final decision of the Commissioner of Social Security is reversed this matter is remanded for further proceedings.

## I.  PROCEDURAL BACKGROUND

Plaintiff Katie Streight applied for Disability Insurance Benefits and Supplemental Security Income benefits on January 13, 2003, alleging an inability to work since August 15, 2002 (Tr. 55-68). Ms. Streight's application was originally denied (Tr. 28-32), and denied again on reconsideration (Tr. 35-37). A hearing before Administrative Law Judge (ALJ) Norman R. Buls was held on August 26, 2004 (Tr. 274-298). The ALJ denied Ms. Streight's appeal in a decision dated January 20, 2005 (Tr. 11-19). The Appeals Council denied Ms. Streight's request for review on June 10, 2005 (Tr. 5-7). This action for judicial review was filed on August 22, 2005.

## II.  FACTUAL BACKGROUND

### A.  Medical History

On January 11, 2001, Ms. Streight was admitted to Broadlawns Medical Center in Des Moines, and was discharged on January 16, 2001 (Tr. 133-139).  She was initially admitted for pain control and suspicion of pelvic inflammatory disease (Tr. 133-139). Following an ultrasound and CT scan of the abdomen and pelvis, both of which were within normal limits, Ms. Streight was discharged with a diagnosis of nephrolithiasis (Tr. 133-139; 152-155).  A sleep apnea study could not be obtained during Ms. Streight's hospitalization due to inadequate respiratory staffing (Tr. 135).  A sleep apnea study was scheduled on an outpatient basis, but does not appear was ever done (Tr. 135).  A chest and lateral x-ray taken on January 13, 2001 showed "no interval change from an examination of August 21, 2000 which showed nonspecific markings in the perihilar regions and no acute infiltration, effusion, or congestion.  The heart, soft tissues, and bones are normal for age."  (Tr. 151).

In October 2001, Ms. Streight was seen at the walk-in clinic at Broadlawns Medical Center complaining of a cough, head congestion, shortness of breath, and some vomiting (Tr. 132).  She reported no chronic pain or difficulty walking at this visit (Tr. 132).  In November 2001, Ms. Streight was seen at the Broadlawns Medical Center Primary Care center for a diabetic check and medication refill (Tr. 131).  During this visit Ms. Streight also complained of increased tiredness, low energy and reported having a history of anemia (Tr. 131).  She also reported that her feet are also numb, but denied having chronic pain or difficulty walking (Tr. 131).  Her diagnoses included peripheral neuropathy (Tr. 131). On December 7, 2001, Ms. Streight was seen at the Broadlawns Medical Center Primary Care Center complaining of flu-like symptoms (Tr. 130).  During this visit she reported no chronic pain and no difficulty walking.  On January 16, 2002, Ms. Streight was seen at the walk-in clinic at Primary Health Care, Inc. complaining of a boil on her inner upper left thigh (Tr. 129).  During this visit she reported having difficulty walking, but no chronic pain (Tr. 129).  On January 17, 2002, Ms. Streight was seen at the walk-in clinic

at Primary Health Care, Inc. for repacking of the dressing on the boil on her left inner thigh (Tr. 128). During this visit she reported having difficulty walking, but no chronic pain (Tr. 128).

On February 25, 2002, Ms. Streight was seen at the walk-in clinic at Primary Health Care, Inc. complaining of a swollen throat and difficulty breathing after eating a Papa John's pizza the night before (Tr. 127). During this visit Ms. Streight reported having difficulty walking, but no chronic pain (Tr. 127). On April 19, 2002, Ms. Streight was seen at the walk-in clinic at Primary Health Care, Inc. for right side back pain (Tr. 126). During the interview with the nurse, Ms. Streight stated that she had no chronic pain and no difficulty walking or bathing (Tr. 126).

On May 20, 2002, Ms. Streight was seen in the emergency department at Broadlawns Medical Center because she was having trouble breathing (Tr. 124). A chest x-ray taken on May 20, 2002 was normal (Tr. 140).

On August 22, 2002, Ms. Streight was admitted to St. Luke's hospital in Cedar Rapids with the primary diagnoses of hypoxemia, acute asthma exacerbation, Type II diabetes, oral medication control, and tobacco abuse (Tr. 164-169). Her chest x-ray was unremarkable (Tr. 164-169). She was given continuous nebulizer and was discharged the following day (Tr. 164-169).

On August 26, 2002, Ms. Streight was readmitted to St. Luke's hospital with the primary diagnoses of obstructive airway disease with asthmatic component, acute asthma exacerbation, Type II diabetes, tobacco abuse, history of pneumonia, and history of nephrolithiasis (Tr. 156-163). She received nebulizer treatments and her coughing improved (Tr. 156). On August 17, 2002 she was seen by Dr. Paynter, who noted that Ms. Streight has chronic obstructive pulmonary disease (Tr. 160). She was discharged on August 30, 2002 (Tr. 156).

On November 6, 2002, Ms. Streight was seen by Dr. Le Ann Larson of the Wolfe Clinic in consultation for extreme visual field (Tr. 172). The records from this visit state that Ms. Streight was extremely light sensitive during the examination and "could hardly

stay up at slit lamp for view." (Tr. 172). Dr. Larson's assessment states "[d]ecreased vision and constricted field of unclear etiology." (Tr. 173). Dr. Larson's plan states "[t]he findings on examination are not entirely consistent with the patients [sic] ambulation and the tunnel fields that don't seem to change in varying distance don't appear physiologic." (Tr. 173). Dr. Larson advised that Ms. Streight follow up with a neuro-ophthalmologist at the University of Iowa for a second opinion (Tr. 173).

On December 9, 2002, Dr. Streight was seen by Dr. Tanya Teggatz and diagnosed with pneumonia, diabetes, asthma, and being noncompliant with medical regimen (Tr. 180). A chest x-ray taken on December 9, 2002 revealed a "[r]adiographically normal chest" (Tr. 198).

On December 16, 2002, Ms. Streight was seen at the University of Iowa Hospitals and Clinics by Dr. Andrew Lee, a neuro-ophthalmologist (Tr. 201-202). According to Dr. Lee's letter to Dr. Larson describing the visit, Ms. Streight reported a past medical history significant for migraine headaches, which are associated with nausea, vomiting, photophobia, and phonophobia, and can last hours to several days (Tr. 201). Ms. Streight also reported that she had been to the emergency room on several occasions for her migraine headaches (Tr. 201). Dr. Lee's letter further states that Ms. Streight had a dilated fundus examination which was normal and, as a result of these findings, was referred to the Neuro-Ophthalmology Clinic (Tr. 201). Confrontation field was a tunnel at one and two meters, which is a "non-organic finding." (Tr. 201). Dr. Lee also noted that Ms. Streight's saccades were accurate and normal outside of the central three to five degrees of her confrontation field, which he also labeled as a "non-organic finding" (Tr. 202). Finally, Dr. Lee's letter states:

> She is extremely photosensitive and I believe this is the cause of her subjective complaint of blurred vision. She has no evidence for optic neuropathy. The optic nerve appearance is normal. Her visual fields are constricted with some nonorganicity at one meter and two meter [sic] and her saccade testing are [sic] also consistent with nonorganic overlay. We are going to have her see neurology to treat her migraines.

4

We deferred any imaging to neurology. The remainder of her
structural eye examination is normal. Hopefully we can treat
her migraine [sic] and we can alleviate her visual symptoms.

(Tr. 202).

On December 23, 2002, Ms. Streight was seen by Dr. Teggatz for a recheck of her
pneumonia and cellulitis. (Tr. 179). Dr. Teggatz diagnosed Ms. Streight with pneumonia,
improved and cellulitis, improving.

On January 10, 2003, Ms. Streight was seen by Dr. Barbara Barnett for a medicine
check (Tr. 179). During this visit Ms. Streight stated that she had recovered well from her
pneumonia and cellulitis (Tr. 179). Dr. Barnett diagnosed Ms. Streight as having
pneumonia resolved, cellulitis resolved, diabetes, allergic rhinitis, asthma, and history of
kidney stones (Tr. 179).

On February 14, 2003, Ms. Streight was seen by Dr. Barnett and diagnosed as
having bronchitis, viral syndrome, furuncle in the right abdomen and history of diabetes
(Tr. 178).

On May 21, 2003, Ms. Streight was seen by Dr. Barnett in follow up to her recent
hospitalization (Tr. 176-177). She was diagnosed as having pneumonia and asthma
(Tr. 177). On May 19, 2003, Ms. Streight was seen at the Mercy Medical Center in
Cedar Rapids complaining of cough, shortness of breath, nausea, and vomiting (Tr. 182).
A chest x-ray revealed right upper lobe pneumonia (Tr. 182, 181, 184). She was admitted
to the hospital and diagnosed as having pneumonia, asthma exacerbation secondary to
pneumonia, diabetes mellitus, hypokalemia, and hypertension (Tr. 182-183).

On June 23, 2003, Ms. Streight had a chest CT which revealed no evidence of a
suprahilar mass, minimal loss of volume in the medial segment of the right middle lobe
with peribronchial cuffing, left lower lung field calcified granuloma, nonspecific mild
mediastinal lymphadenopathy, and two small indeterminate nodules measuring 3 mm in
the right upper lung field (Tr. 175).

On November 3, 2003, Ms. Streight was seen by Dr. Deeney, pursuant to a referral
from Dr. Barnett for the evaluation of a lesion of the bottom of her right heal (Tr. 101).

Dr. Deeney's records of this visit state "[s]he is only 33 and at this time is almost neuropathic (Tr. 101).

Ms. Streight established care with Dr. Anne Voigts at Internists, P.C. on February 26, 2004 (Tr. 233-235). During this initial visit Ms. Streight complained of difficulty with her eyes in that she cannot see (Tr. 235). She also reported that she tires easily and that her blood sugars have been poorly controlled (Tr. 235). Ms. Streight noted headaches continually on the top of her head, dizziness, and multiple falls (Tr. 234). Ms. Streight's examination was remarkable for stocking-glove peripheral neuropathy, although she had no ulceration son her feet, and no other neurological problems (Tr. 234). Dr. Voigts suggested that Ms. Streight have a CT scan done on her head to rule out intracranial abnormality (Tr. 233-34).

On March 31, 2004 Ms. Streight was seen by Dr. Voigts to follow up on her Type II diabetes, headaches, and dizziness (Tr. 232). During this visit Ms. Streight reported that he had been having significant problems with a migraine headache over the past three days (Tr. 232). Dr. Voigts' records further state that Ms. Streight has a neurology appointment scheduled for later in April and that the CT scan of Ms. Streight's head showed no evidence of intracranial abnormality (Tr. 232).

On April 29, 2004 Ms. Streight was seen by Dr. Voigts wherein Ms. Streight reported that she has been tired and having difficulty sleeping, and has continued to have headaches (Tr. 231). Ms. Streight's physical exam revealed clear lungs, no cardiovascular murmur and no over peripheral edema (Tr. 230). Dr. Voigts' records from this visit further provide that Ms. Streight's blood pressure is well controlled, her volume status is stable, her diabetic control has improved and that Ms. Streight will follow up with Dr. Young regarding her headaches and neuropathy management (Tr. 230). Dr. Voigts' notes state that the amitriptyline medication may be making Ms. Streight more fatigued (Tr. 230).

On May 29, 2004 Ms. Streight was admitted to Mercy Medical Center ICU with hypoxemic respiratory failure and COPD with questionable pneumontis (Tr. 227). She

was discharged on June 4, 2004 with diagnoses of acute exacerbation of COPD, hypoxemic respiratory failure, possible pneumonitis, Type II diabetes Mellitus, and migrainous headache. (Tr. 227).

On July 1, 2004, Ms. Streight was seen by Dr. Voigts (Tr. 229). During this visit Ms. Streight reported that she was still having intermittent headaches and noted that she has had some intermittent numbness in her left hand (Tr. 229). Ms. Streight further reported swelling in her feet, difficulty sleeping, and some blood when she passes her bowel movements (Tr. 229). Dr. Voigts' impression from the visit was that Ms. Streight's respiratory status is stable, and she recommended further tests for Ms. Streight's left arm numbness, rectal bleeding, diabetic foot problems, and a sleep study (Tr. 229).

On August 8, 2004 Ms. Streight underwent a colonoscopy that revealed several benign hyperplastic polyps, which are not the type of polyps that carry a cancer risk (Tr. 226). The colonoscopy also revealed some diverticular disease (Tr. 226). On October 14, 2004, Ms. Streight underwent a sleep study (Tr. 245).

## B. Plaintiff's Subjective Complaints

On March 3, 2002, Ms. Streight completed a personal pain/fatigue questionnaire (Tr. 92-95). She claims that her pain varies from day to day and is sometimes in her legs and other times in her kidneys (Tr. 92). Long distance walking, bending over, and long distance car rides worsen her pain and fatigue (Tr. 92). Her fatigue lasts all of the time and her pain lasts from 15 minutes to all day (Tr. 92). Ms. Streight takes Tylenol #3 and hydrocodone for her pain, which she claims helps, but does not make it go away (Tr. 93). Hot baths sometimes help the pain in her legs and she usually naps in the afternoon to combat the fatigue (Tr. 93). Her eye pain keeps her from seeing so that she can cook (Tr. 93). As a result of her pain and fatigue, Ms. Streight claims that she is restricted in driving, playing with her kids, cooking, reading, and exercising (Tr. 93). Ms. Streight states that she is lucky to get three to five hours of sleep per day as she cannot get comfortable without having either pain or migraines (Tr. 94). She claims that she cannot help her children with their homework because she cannot see it (Tr. 94). She cannot

concentrate on watching movies or it gives her a headache and she usually ends up falling asleep (Tr. 94). It takes her longer to clean her house because she gets tired and her legs and feet start to hurt from moving around (Tr. 94). Her hands hurt because she has to poke them often to check her blood sugar level (Tr. 94). Ms. Streight states that she starts to breathe hard if she carries anything over 20 pounds because of her asthma (Tr. 94). She also loses her breath and gets tired on the half-block walk to her mailbox (Tr. 95). Her legs hurt if she stands more than an hour (Tr. 95).

On June 24, 2003 Ms. Streight completed another personal pain/fatigue questionnaire wherein she stated that she suffers from pain in her eyes, legs, and feet, and that such pain is usually a seven or eight on a 10-point scale, depending on what she is doing (Tr. 96). Ms. Streight complains of being tired almost all of the time, and that the pain moves all over her body (Tr. 96). She claims that her legs and feet have gotten worse (Tr. 97). Ms. Streight states that her legs hurt so that she cannot get up and move and that her eyes start to hurt so that it causes a migraine (Tr. 97). Her chores and doing fun things with her family have been restricted because of her pain and fatigue (Tr. 97).

Also in June 2003 Ms. Streight completed a daily activities questionnaire wherein she states that she bathed/showered with help or reminders and shaved with help or reminders, explaining that she has a hard time seeing to shave her legs and underarms and cuts herself a lot (Tr. 88). Ms. Streight further states that she has to leave night-lights on in her house so she does not run into things in the night, and that she quits breathing while sleeping (Tr. 88). She states that she needs help or reminders to do laundry, dishes, to change sheets, to vacuum/sweep and that she has trouble setting the washing machine because she cannot see the knob (Tr. 88). Ms. Streight claims that her husband does all of the cooking because she cannot see to set the flame, cannot tell if the food is done, and cannot see to set the microwave (Tr. 89). Ms. Streight states that she does not drive because due to her eyesight and that she cannot see a bus schedule without someone reading it to her (Tr. 89). Ms. Streight has three minor children, but states that she basically just supervises them and answers questions (Tr. 89). Ms. Streight states that she

has no hobbies because she cannot see them and because she cannot be out in the sun for long periods of time (Tr. 90). She does not watch television because she has to be "right on top of the tv" to see it and that gives her a headache (Tr. 90). Instead, she listens to the radio (Tr. 90). Ms. Streight does not ready because the print is too small (Tr. 90).

Regarding social functioning, Ms. Streight has friends that visit her and her husband takes her to Des Moines once a month to see her family (Tr. 90). Ms. Streight claims that she has trouble completing tasks or chores because she gets tired and out of breath and her feet and legs get sore (Tr. 91). Ms. Streight states that she can pay the bills as long as someone tell her how much they are and gives her a ride to pay them (Tr. 91).

## C. Hearing Testimony

Ms. Streight was born on May 28, 1970 and has a GED. (Tr. 277). Ms. Streight last worked in either August or September of 2002, at the Salvation Army, but testified at the hearing before the ALJ that she was terminated from that job for taking off work to be with her husband while he had surgery (Tr. 283). She applied for other jobs, but claims that no one would hire her because of all of her health problems, i.e., COPD, diabetes, vision problems, frequent migraines, asthma, and allergies (Tr. 283). Ms. Streight testified that she is allergic to grass, trees, pollen, flowers, animal dander, dust, dust mites, mold, mildew, and that she has food and medication allergies (Tr. 286). Ms. Streight claimed that she could no longer perform the work she did at the Salvation Army because she cannot see well enough to count change.

At the hearing, Ms. Streight testified that she no longer has a driver's license because the Department of Transportation refused to renew it because her vision was not good enough (Tr. 279). Ms. Streight claims that her vision is so poor that she has to literally sit on top of the television to watch it and hold documents very close to her eyes to read. As of the time of the hearing, Ms. Streight had not had new glasses for four years, but testified that she was told by an eye doctor a couple of weeks prior to the hearing that new glasses would not help her vision (Tr. 280). When questioned regarding the eye doctors' reports that Ms. Streight's straight ahead vision was good, Ms. Streight

disagreed, stating that she's "constantly falling down and hurting myself and burning myself." (Tr. 280; 287). When pressed on her disagreement with the doctors' findings, Ms. Streight testified that certain testing cannot be done on her eyes because she would have a deadly reaction to the IVP dye (Tr. 288).

Regarding her diabetes, Ms. Streight testified that she has no feeling at all in her feet and that the neuropathy is moving up her legs and starting in her hands (Tr. 289). Ms. Streight further stated that she has carpal tunnel syndrome (Tr. 289). Ms. Streight testified that the neuropathy in her feet causes her to wobble a lot and fall into the counter, and that she constantly drops things and burning herself due to the neuropathy in her hands (Tr. 289, 290).

When asked about the colonoscopy she had recently undergone, Ms. Streight reported that her colon was 45 percent covered with polyps and that she has diverticulitis (Tr. 292). Ms. Streight further testified that she experiences large quantities of rectal bleeding, even when she is not having a bowel movement (Tr. 293). When questioned about the doctor's report of the colonoscopy, which stated that Ms. Streight had "several small benign hyperplastic polyps" which are "NOT the type of polyps that a cancer risk" and "some diverticular disease" Ms. Streight claimed that she had not spoken to her doctor following the test (Tr. 293).

Regarding her migraine headaches, Ms. Streight testified that she has them two or three times a week and that they seem like they last forever (Tr. 294). When she has a migraine headache, Ms. Streight testified that any sound or smell of food makes her vomit, and that she is sensitive to light also (Tr. 294). Ms. Streight testified that she has had migraines of this degree since she was a teenager (Tr. 295).

Finally, regarding fluid retention, Ms. Streight testified that drinking fluid or eating melons makes her "blow up like a balloon" because she retains all of the water, which is not always alleviated by the fluid pill she takes daily (Tr. 296). According to Ms. Streight, Dr. Voigts told her to elevate her legs all of the time (Tr. 296-297).

Ms. Streight testified that she has been having fluid retention problems for three to four weeks prior to the hearing (Tr. 297).

D.  Competing RFCs

On April 9, 2003, state consulting physician Dr. Dennis Weis completed a physical residual functional capacity assessment for Ms. Streight, which provided that she could lift and/or carry 50 pounds occasionally, 25 pounds frequently, stand and/or walk a total of about 6 hours in an 8-hour workday, sit a total of about 6 hours in an 8-hour workday, and is unlimited in her ability to push and/or pull (Tr. 207-214).  Dr. Weis further opined that Ms. Streight could climb, balance, stoop, kneel, crouch, and crawl frequently, and had no established manipulative limitations with respect to reaching in all directions, handling, fingering, and feeling (Tr. 209, 210).  Dr. Weis did provide that Ms. Streight was limited in her near and far acuity, but unlimited in her depth perception, accommodation, color vision, and field of vision (Tr. 210).  Dr. Weis opined that Ms. Streight had no communicative limitations and was unlimited in her exposures to extreme cold, extreme heat, wetness, humidity, noise, and vibration, should avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, and hazards such as machinery and heights (Tr. 211).  Dr. Claude Koons affirmed Dr. Weis' assessment on July 30, 2003 (Tr. 214).

On January 24, 2003, Dr. Barnett, one of Ms. Streight's treating physicians, wrote a letter to the Disability Determination Services Bureau which stated:

> I am unaware that she is applying for disability secondary to her diabetes.  She sees a specialist for her vision problems, and her asthma has been under fair control while she has been a patient in our office.  I cannot comment [sic] any limitations she may have for lifting, carrying, standing, etc.  From her history I can imagine a work environment with certain fumes, dust, etc. and extreme temperatures may aggravate her asthma symptoms.

(Tr. 204).

On April 29, 2004, Dr. Voigts completed a diabetes mellitus residual functional capacity questionnaire, provided by Ms. Streight's attorney, wherein she diagnosed

Ms. Streight as suffering from Type II diabetes, headaches, peripheral neuropathy, and diabetic retinopathy (Tr. 221). Dr. Voigts identified Ms. Streight's symptoms as fatigue, difficulty walking, episodic vision blurriness, excessive thirst, swelling, sensitivity to light, heat or cold, general malaise, muscle weakness, retinopathy, hot flashes, abdominal pain, vascular disease/leg cramping, nausea/vomiting, extremity pain and numbness, loss of manual dexterity, frequency of urination, sweating, difficulty thinking/concentrating, dizziness/loss of balance, and headaches (Tr. 221). Dr. Voigts opined that Ms. Streight's impairments have lasted or can be expected to last at least twelve months, that Ms. Streight is not a malingerer, and that her impairments are reasonably consistent with the symptoms and functional limitations described in the evaluation (Tr. 222). Dr. Voigts further opined that Ms. Streight's pain and symptoms would frequently interfere with the attention and concentration needed to perform even simple work tasks and that Ms. Streight was only capable of working a low stress job (Tr. 222). Dr. Voigts states that Ms. Streight can walk 1½ city blocks without rest or severe pain, can sit 30 minutes at one time, can stand 15 minutes at one time, can sit and stand/walk for about two hours total in an eight-hour workday, and would need to get up and walk for five minutes every fifteen minutes (Tr. 222-223). According to Dr. Voigts, Ms. Streight would need a job that permitted shifting positions at will from sitting, standing or walking, and would need to take several 15-minute unscheduled breaks during an eight-hour workday (Tr. 223). Dr. Voigts stated that Ms. Streight must use a cane or other assistive device while engaging in occasional standing/walking, and could frequently lift and carry less than 10 pounds, occasionally lift and carry 10 pounds, and never lift and carry 20 pounds (Tr. 223). Ms. Streight can rarely twist, occasionally stoop, and never crouch/squat, climb ladders, or climb stairs (Tr. 224). Dr. Voigts states that Ms. Streight has no significant limitations with reaching, handling or fingers, but should only use her hands to grasp, turn and twist objects five percent of an eight-hour workday, use her fingers for fine manipulation for 10 percent of an eight-hour workday, and use her arms for reaching for five percent of the workday (Tr. 224). Dr. Voigts opines that Ms. Streight should avoid all exposure to extreme cold,

extreme heat, high humidity, wetness, soldering fluxes, solvents/cleaners, fumes, odors, gases, chemicals, and other irritants, and should avoid concentrated exposure to cigarette smoke, perfumes, and dust (Tr. 224). Dr. Voigts further provides that Ms. Streight's impairments are likely to produce "good days" and "bad days" and that Ms. Streight would likely to be absent more than four days per month as a result of her impairments or treatment (Tr. 224).

On September 29, 2004 Dr. Michael Hall of Iowa Eye Center sent a letter to Disability Determination Services summarizing his post-hearing evaluation of Ms. Streight (Tr. 236). His letter states, in pertinent part:

> Her past ocular history is significant for evaluation at UIHC for unexplained vision loss. The conclusion of that evaluation was that the vision loss was non-organic functional visual loss. They felt that her structural eye exam was normal.
>
> In summary, Katie Streight has diabetes but no evidence of diabetic retinopathy. She had a small lenticular opacity in the right eye which was not visually significant. There was no reason today identified for her decreased vision. I concur with the previous evaluation that concluded the visual loss was most likely not organic in nature.

(Tr. 236).

On October 4, 2004, Dr. Hall completed a Medical Source Statement of Ability to do Work-Related Activities (Physical) which stated that Ms. Streight had no exertional limitations in terms of lifting/carrying, standing/walking, sitting, or pushing/pulling (Tr. 237-238). Dr. Hall further opined that Ms. Streight could frequently climb, balance, kneel, crouch, crawl, and stoop (Tr. 238). Dr. Hall opined that Ms. Streight was limited in her ability to see, but stated:

> This pt. claims to have vision loss in both eyes to the level of only light perception, but clearly can see better than this on exam as indicated by her ability to fix and follow a non-illuminated object easily with either eye and ability to avoid objects in her way with walking. This is consistent with a previous exam at the University of Iowa in which she initially

claimed to only be able to count fingers in either eye but with a low correction in both eyes read 20/20. There clearly is a functional overlay to this pts. visual loss as structurally her eye exam is normal.

(Tr. 239).

## II. CONCLUSIONS OF LAW

### A. Scope of Review

In order for the court to affirm the ALJ's findings of fact, those findings must be supported by substantial evidence appearing in the record as a whole. See Lochner v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992); Cruse v. Bowen, 867 F.2d 1183, 1184 (8th Cir. 1989). Substantial evidence is more than a mere scintilla. It means relevant evidence a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1997); Cruse, 867 F.2d at 1184; Taylor v. Bowen, 805 F.2d 329, 331 (8th Cir. 1986). The court must take into account evidence that fairly detracts from the ALJ's findings. Cruse, 867 F.2d at 1184; Hall v. Bowen, 830 F.2d 906, 911 (8th Cir. 1987). Substantial evidence requires "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." Cruse, 867 F.2d at 1184 (quoting Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966)). The court must consider the weight of the evidence appearing in the record and apply a balancing test to contradictory evidence. Gunnels v. Bowen, 867 F.2d 1121, 1124 (8th Cir. 1989); Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987).

### B. ALJ's Disability Determination

Determining whether a claimant is disabled involves a five-step evaluation. See 20 C.F.R. § 404.1520(a)–(f); Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The five steps are:

(1)     If the claimant is engaged in substantial gainful activity, disability benefits are denied.

(2)     If the claimant is not engaged in substantial gainful activity, her medical condition is evaluated to determine

whether her impairment, or combination of impairments, is medically severe. If the impairment is not severe, benefits are denied.

(3)   If the impairment is severe, it is compared with the listed impairments the Secretary acknowledges as precluding substantial gainful activity. If the impairment is equivalent to one of the listed impairments, the claimant is disabled.

(4)   If there is no conclusive determination of severe impairment, then the Secretary determines whether the claimant is prevented from performing the work she performed in the past. If the claimant is able to perform her previous work, she is not disabled.

(5)   If the claimant cannot do her previous work, the Secretary must determine whether she is able to perform other work in the national economy given her age, education, and work experience.

Trenary v. Bowen, 898 F.2d 1361, 1364 n.3 (8th Cir. 1990). (citing Yuckert, 482 U.S. at 140–42); 20 C.F.R. § 404.1520(a)–(f).

"To establish a disability claim, the claimant bears the initial burden of proof to show that he [or she] is unable to perform his [or her] past relevant work." Frankl v. Shalala, 47 F.3d 935, 937 (8th Cir. 1995) (citing Reed v. Sullivan, 988 F.2d 812, 815 (8th Cir. 1993)). If the claimant meets this burden, the burden of proof then shifts to the Commissioner to demonstrate that the claimant retains the physical residual functional capacity (RFC). to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and vocational factors such as age, education and work experience. Id.

Under the first step of the analysis, the ALJ found that Ms. Streight had not engaged in substantial gainful activity since her alleged onset date (Tr. 18). At the second step, the ALJ determined that Ms. Streight's asthma and diabetes mellitus are severe impairments (Tr. 19). At the third step, the ALJ determined that Ms. Streight's

impairments did not meet or equal one of the listed impairments (Tr. 19). At the fourth and fifth steps, the ALJ determined that Ms. Streight has the residual functional capacity to perform a full range of sedentary work and therefore was not "disabled." (Tr. 19).

## C. Credibility Determination

Ms. Streight claims that the ALJ failed to evaluate Ms. Streight's credibility according to the Polaski standard. See Polaski v. Heckler, 739 f.2d 1320 (8th Cir. 1984). Ms. Straight argues that her subjective allegations of pain and fatigue are inconsistent with the ability to perform competitive employment, and are consistent with both the medical records generally and with the opinion of Ms. Streight's treating physician. According to Ms. Streight, the ALJ failed to identify inconsistencies in the record as a whole in discrediting her subjective complaints. Specifically, Ms. Streight contends that as a result of the combined effect of her impairments, i.e., diabetes, diabetic neuropathy, asthma, water retention, obesity, and sleep apnea, she does not have the ability to perform competitive employment, and that inability is consistent both with the medical evidence and with the record as a whole.

The Commissioner counters that the ALJ properly evaluated Ms. Streight's credibility, and is consistent with the standard for evaluating pain and other subjective complaints set forth in Polaski. The Commissioner describes in detail Ms. Streight's medical record and alleged daily living restrictions, and argues that the accumulation of contradicted statements, unsupported allegations, and symptom exaggeration forms a sufficient basis upon which the ALJ could determine that Ms. Streight's claims of disabling pain and fatigue were not credible. Alternatively, the Commissioner argues that the ALJ adequately accounted for her Ms. Streight's alleged fatigue in limiting her to sedentary work, which involves mostly sitting and very little lifting.

In finding that Ms. Streight's credibility was "effectively eroded," the ALJ relied on Dr. Hall's findings (Tr. 238) that Ms. Streight "claims to have vision loss in both eyes to the level of only light perception, but clearly can see better than this on exam as indicated by her ability to fix and follow a non illuminated object easily with either eye and

16

ability to avoid objects in her way with walking." (Tr. 17). The ALJ further noted that Dr. Hall's conclusions were consistent with Ms. Streight's prior examination at the UIHC where Ms. Streight claimed that she only saw well enough to count fingers with either eye, but with low correction could actually read 20/20 (Tr. 17). The ALJ also relied on the fact that Ms. Streight is capable of full self care needs, does some household cleaning, and has no problems sitting (Tr. 17).

When evaluating the credibility of a claimant's subjective complaints, the ALJ may not disregard them "solely because the objective medical evidence does not fully support them." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). "The [ALJ] is not free to accept or reject the claimant's subjective complaints solely on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole." Id. In evaluating claimant's subjective impairment, the following factors are considered: (1) the applicant's daily activities; (2) the duration, frequency and intensity of pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions. Id. at 1321-22. Subjective complaints may be discounted if inconsistencies exist in the evidence as a whole. Hinchey v. Shalala, 29 F.3d 428, 432 (8th Cir. 1994); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993). Where an ALJ seriously considers but for good reasons explicitly discredits a plaintiff's subjective complaints, the court will not disturb the ALJ's credibility determination. Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001).

However, "a claimant need not prove that he or she is bedridden or completely helpless to be found disabled." Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). See also Keller v. Shalala, 26 F.3d 856, 859 (8th Cir. 1994). (finding it error to discredit the claimant's subjective complaints of pain based on her daily activities which consisted of watching television, taking care of her dogs, and doing household chores, which claimant testified she could not do when she was suffering from a disabling headache); Forehand v. Barnhart, 364 F.3d 984, 988 (8th Cir. 2004). ("We have long stated that to determine whether a claimant has the residual functional capacity necessary to be able to

work we look to whether she has 'the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" (citing <u>McCoy v. Schweiker</u>, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc)). When evaluating the credibility of a claimant's subjective complaints, the ALJ may not disregard complaints "solely because the objective medical evidence does not fully support them." <u>Polaski</u>, 739 F.2d at 1322. Furthermore, "[t]he [ALJ] is not free to accept or reject the claimant's subjective complaints solely on the basis of personal observations.

The court finds ample inconsistencies in the record as a whole to support the ALJ's credibility determination. While Ms. Streight's medical records do mention some fatigue and increased tiredness, the records as a whole do not demonstrate that Ms. Streight was complaining of disabling fatigue to her treating physicians, as she is now. A review of the medical records also shows that Ms. Streight was consistently reporting that she was experiencing no chronic pain or trouble walking. In her personal pain/fatigue questionnaires, Ms. Streight claimed that she loses her breath by walking a half-block to the mailbox and that she constantly suffers from severe pain in her eyes, legs, and feet. Ms. Streight's eye examination by Dr. LeAnn Larson of the Wolfe Clinic in November 2002 resulted in findings that were not entirely consistent with Ms. Streight's ambulation and tunnel fields. Dr. Lee at the UIHC had a similar result, i.e., Ms. Streight's alleged tunnel vision was a non-organic finding. Dr. Hall reached the same result. Ms. Streight disputed the doctors' findings regarding her vision at the hearing, explaining for the first time that certain tests cannot be performed on her eyes because she would have a deadly reaction to the dye used. Such an allegation appears in none of the records of any of the eye doctors who have seen Ms. Streight. Ms. Streight also complained to Dr. Lee that she had been to the emergency room on several occasions for her migraine headaches. The court could not find records of any such visits. Finally, Ms. Streight testified at the hearing that a recent colonoscopy had revealed that her colon was 45 percent covered in polyps and that she was experiencing large quantities of rectal bleeding, even when she is

not having a bowel movement.  The actual results of the colonoscopy revealed several small benign hyperplastic polyps and Ms. Streight's medical records do not support her allegation regarding the rectal bleeding.  The ALJ's credibility determination is supported by substantial evidence on the record as a whole and will not be disturbed.  See Jenkins v. Brown, 861 F.2d 1083, 1086 (noting that exaggeration of symptoms is a factor to be weighed in evaluating subjective complaints of pain); Gulliams v. Barnhart, 393 F.3d 798, 800 (8th Cir. 2005 (concluding that the ALJ's determination that plaintiff's complaints of pain were exaggerated was supported by substantial evidence).

### D.  Treating Physician

Ms. Streight argues that the ALJ improperly discounted the opinion of her treating physician, Dr. Voigts, which are consistent with Ms. Streight's subjective allegations of pain and fatigue.  Ms. Streight contends that Dr. Voigts' opinions are only part of a larger record that fully supports her opinions that Ms. Streight is not capable of full-time, competitive employment.  The Commissioner counters that the ALJ gave valid, legally sufficient reasons for his treatment of Dr. Voigts' opinion, i.e., it was internally inconsistent and unfounded in the context of the record as a whole.

The ALJ gave no weight to Dr. Voigts' conclusion that Ms. Streight cannot perform even sedentary work, noting that Dr. Voigts' assessment was presented in a checklist manner without reference to any medical evidence.  The ALJ further noted that Dr. Voigts' opinion was internally inconsistent and contrary to the evidence of record, i.e., Dr. Voigts found that Ms. Streight could sit for only 30 minutes at a time and for only two hours in an eight-hour day, when Ms. Streight herself alleges no such difficulty and the medical records do not support a sitting restriction.  Dr. Voigts stated that Ms. Streight must walk with a cane, although Ms. Streight does not use a cane and the medical records do not recommend use of a cane.  Finally, Dr. Voigts opined that Ms. Streight had no significant limitations with reaching, handling, or fingering, but then stated that Ms. Streight could not use her hands, fingers, and arms no more than 10% of the time.

"A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight. A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (citation omitted). The regulations require the ALJ to give reasons for giving weight to or rejecting the statements of a treating physician. See 20 C.F.R. § 404.1527(d)(2). Whether the ALJ gives great or small weight to the opinions of treating physicians, the ALJ must give good reasons for giving the opinions that weight. Holmstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001). Moreover, a treating physician's opinion does not deserve controlling weight when it is nothing more than a conclusory statement. Piepgras v. Chater, 76 F.3d 223, 236 (8th Cir. 1996). See also Thomas v. Sullivan, 928 F.2d 255, 259 (8th Cir. 1991) (holding that the weight given a treating physician's opinion is limited if the opinion consists only of conclusory statements).

Ms. Streight established care with Dr. Voigts on February 26, 2004. Dr. Voigts offered her extremely limiting opinion of Ms. Streight's abilities two months later, on April 29, 2004. The ALJ properly discounted Dr. Voigts' opinion, as set forth in his findings. It was not supported by the medical records, was inconsistent, and generally exaggerated.

E.  Residual Functional Capacity

Finally, Ms. Streight contends that the ALJ erred in failing to include any non-exertional limitations in his assessment of Ms. Streight's residual functional capacity.[1]

---

[1]Nonexertional limitations are limitations other than on strength but which nonetheless reduce an individual's ability to work. Examples are mental, sensory or skin (continued...)

Specifically, Ms. Streight contends that the ALJ's finding that she could perform the full range of sedentary work[2] is contrary to Dr. Voigts' opinion that Mr. Streight should avoid all exposure to extreme heat and cold, high humidity, soldering fluxes, solvents and cleaners, and fumes, odors, and gases, Dr. Barnett's opinion that fumes, dust, and extreme temperatures would aggravate Ms. Streight's asthma, and Dr. Weis and Dr. Koons' opinion that Ms. Streight should avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, and hazards. In support of her argument, Ms. Streight cites to Asher v. Brown, 837 F.2d 825, 827-28 (8th Cir. 1988), wherein the Eighth Circuit noted that 85% of unskilled sedentary jobs are in the machine trades and bench work categories, and that vocational expert testimony was necessary to identify unskilled sedentary jobs performed in a clean work environment. Ms. Streight further argues that the ALJ's finding is contrary to Dr. Voigts and Dr. Deeney's diagnoses of carpal tunnel and diabetic neuropathy in her hands, and fails to account for the fact that unskilled sedentary work requires bilateral manual dexterity and good use of hands. See SSR 83-10, 85-15. Ms. Streight claims that the ALJ's RFC is erroneous in that it failed to impose any limitations with regarding her limited vision.

The Commissioner notes that the ALJ included a limitation against concentrated exposure to fumes in his RFC, which is fully supported by the record. According to the Commissioner, Dr. Voigts' limitations were properly discredited and Ms. Streight's visual limitations are likewise discredited as unfounded on any medically determinable impairment.

As set forth above, Dr. Voigts' opinion was properly discredited by the ALJ, as were Ms. Streight's allegations regarding her visual impairment. However, the court

---

[1](…continued)
impairments, as well as impairments which result in postural and manipulative limitations or environmental restrictions. See 20 C.F.R. Subpart P, App. 2, §200.00(e) (1992).

[2]Sedentary work requires sitting, occasional walking and standing, and lifting no more than ten pounds. See 20 C.F.R. §404.1567(a)(1992).

cannot reconcile the ALJ's determination that Ms. Streight must avoid concentrated exposure to fumes with his subsequent reliance on the Medical-Vocational Guidelines which, according to the ALJ's decision, "may be used to direct an unfavorable decision only if . . . there are no nonexertional limitations," and his ultimate finding that Ms. Streight "can perform the demands of the full range of sedentary work" (Tr. 18).

The ALJ found that Ms. Streight was unable to perform any of her past relevant work (Tr. 19). At this point, the burden shifted to the Commissioner to show that Ms. Streight was able to engage in work in the national economy. Sanders v. Sullivan, 983 F.2d 822 (8th Cir. 1992). "[A]n ALJ may use the Guidelines even though there is a nonexertional impairment if the ALJ finds, and the record supports the finding, that the nonexertional impairment does not diminish the claimant's residual functional capacity to perform the full range of activities listed in the Guidelines." Thompson v. Bowen, 850 F.2d 346, 349-50 (8th Cir. 1988). "However, if the claimant's nonexertional impairments diminish his or her residual functional capacity to perform the full range of activities listed in the Guidelines, the Secretary must produce expert vocational testimony or other similar evidence to establish that there are jobs available in the national economy for a person with claimant's characteristics." Sanders, 983 F.2d at 822.

Ms. Streight's struggles with her asthma and allergies are well documented in the record. She has been hospitalized on several occasions as a result of acute asthma attacks. All health care professionals, both treating and consulting, agree that Ms. Streight should avoid exposure to fumes, odors, dusts, etc. The ALJ's reliance on the Medical-Vocational Guidelines in this instance was misplaced, as the record does not support the finding that Ms. Streight's nonexertional impairment regarding her exposure to fumes, odors, dusts, etc. would not diminish her residual functional capacity to perform the full range of sedentary work. As set forth in Sanders, the Commissioner must produce expert vocational testimony or other similar evidence establishing that there are sedentary jobs available in the national economy for a person who must avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, and hazards. See Asher, 837 F.2d at 828

("We think the Secretary improperly determined, without the benefit of further testimony such as that of a vocational expert, and without discussing or distinguishing the cases to consider this issue, that the majority of unskilled sedentary jobs in the national economy take place in a pollution-free environment. The Secretary's conclusion in this regard stands alone, with no evidence to support it, and is contradicted by his own regulations and the cases that have considered this issue.").

Upon the foregoing,

IT IS ORDERED that the determination of the ALJ is reversed and this matter is remanded for further proceedings and detailed findings regarding the availability of unskilled sedentary jobs available in the national economy for a person who must avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, and hazards.

June 2, 2006.

JOHN A. JARVEY
Magistrate Judge
UNITED STATES DISTRICT COURT